IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EDWARD RAY ESPARZA, | § | |
| TDCJ #704087, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-11-3803 |
| | § | |
| RICK THALER, Director, | § | |
| Texas Department of Criminal Justice - | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

The petitioner, Edward Ray Esparza (TDCJ #704087), seeks a writ of habeas corpus under 28 U.S.C. § 2254 to challenge a state court conviction for aggravated sexual assault that was entered against him in 1995. The respondent has answered with a motion to dismiss the petition as an unauthorized successive writ application [Doc. # 7]. Esparza has filed a reply [Doc. # 10]. After reviewing all of the pleadings, the state court records, and the applicable law, the Court grants the respondent's motion and dismisses this case for reasons set forth below.

## I.   BACKGROUND AND PROCEDURAL HISTORY

Before reaching the parties' contentions, it is necessary to summarize the background of Esparza's underlying criminal conviction and state court proceedings, which have included more than one appeal and multiple applications for collateral review.

A local grand jury returned an indictment against Esparza in Harris County cause number 94-06505, charging him with aggravated sexual assault. The State enhanced the indictment for purposes of punishment with allegations that Esparza had two prior felony convictions. At trial, the State presented evidence that Esparza sexually assaulted a woman whom he met at a Houston night club. A jury in the 263rd District Court of Harris County, Texas, found Esparza guilty as charged. During the sentencing phase of the trial, the State presented evidence that Esparza had several prior felony convictions. After finding that Esparza had at least two prior felony convictions, as alleged in the indictment, the jury sentenced him to life imprisonment on February 15, 1995.

Esparza's conviction was affirmed on direct appeal, but the sentence was overturned because the State failed to prove that one of the felony convictions that was used to enhance the indictment was "final" for purposes of enhancing Esparza's punishment. *See Esparza v. State*, No. 01-95-00182-CR, 1996 WL 404028 (Tex. App. — Houston [1st Dist.] July 18, 1996, no pet.). On remand for a new sentencing proceeding, a jury again sentenced Esparza to life in prison in a judgment entered on April 17, 1997. That sentence was affirmed on direct appeal, *see Esparza v. State*, No. 14-97-00440-CR, 1999 WL 548237 (Tex. App. — Houston [14th Dist.] July 29, 1999), and the Texas Court of Criminal Appeals denied Esparza's petition for discretionary review of the sentence on November 24, 1999.

Esparza challenged his conviction further by filing an application for a state writ of habeas corpus under Article 11.07 of the Texas Code of Criminal Procedure. Esparza argued that the evidence was legally and factually insufficient to support the conviction. Esparza

2

argued further that the evidence was insufficient to show that force was used to commit the offense or that the victim was placed in fear. Esparza also argued that the life sentence was barred by collateral estoppel, that the trial court gave improper instructions to the jury, and that he was denied effective assistance of counsel. The state habeas corpus court, which also presided over the trial, entered written findings and recommended that relief be denied. The Texas Court of Criminal Appeals agreed and denied relief based on the trial court's findings on March 28, 2001. *See Ex parte Esparza*, No. 11,882-04.

On August 1, 2001, Esparza filed a federal habeas corpus petition in this district, raising essentially the same claims presented in his state application. The district court rejected all of Esparza's claims and dismissed the petition with prejudice. *See Esparza v. Cockrell*, Civil No. 4:01-2826 (S.D. Tex.). The Fifth Circuit denied a certificate of appealability. *See Esparza v. Cockrell*, No. 03-20064 (5th Cir. May 9, 2003). Esparza filed a motion for reconsideration or rehearing, which the Fifth Circuit denied on June 24, 2004. The United States Supreme Court denied Esparza's petition for a writ of certiorari on February 22, 2005. *See Esparza v. Dretke*, 543 U.S. 1158 (2005).

While Esparza's federal habeas appeal was pending in the Fifth Circuit, he filed a motion for post-conviction DNA testing under Chapter 64 of the Texas Code of Criminal Procedure with the state trial court. This provision allows DNA testing if the following criteria are met: (1) evidence exists in a condition that makes DNA testing possible; (2) identity was or is an issue in the case; and (3) the defendant has established, by a preponderance of the evidence that he would not have been convicted if exculpatory results

had been obtained through the DNA testing process. *See* Tex. Code Crim. Proc. 64.03(a).

The trial court denied the motion on September 27, 2005.

Esparza filed a direct appeal, arguing that the trial court erred by denying his motion

for DNA testing. An intermediate court of appeals affirmed the decision after summarizing

the evidence presented at trial, as follows:

> At trial, Hermina Cantu Lucero, the complainant's aunt, testified that on the evening of January 1, 1994, she, the complainant, the complainant's sister, Mary Cantu, and "some other members of the family and friends" went to a nightclub in Houston around 9:30 or 10:00 p.m. Lucero and the complainant were living in Bryan, Texas at the time and drove into Houston for the night. While at the nightclub, [Esparza] was standing near where Lucero was standing, and she noticed that [Esparza] "kept starting and eventually he came and asked [her] to dance." Lucero explained that this occurred around 10:30 or 11:00 p.m. The two danced several times, [Esparza] bought her a drink, and they talked for "a couple of hours." When Lucero, [Esparza], and the complainant were leaving the club between 1:30 and 2:00 a.m., Lucero noticed that the complainant's car had been towed. The three then went back inside the club and discovered the location to which the car had been towed.

> Lucero stated that [Esparza] volunteered to drive Lucero and the complainant to the tow yard, and the three followed Cantu and her friend there. Upon arriving at the tow yard, they realized that they did not have enough money to pay the impound fee. Lucero and the complainant had to return to Bryan because the complainant had to be back at 6:00 a.m. to go to work, and they accepted [Esparza]'s offer to drive them back to Bryan.

> With Lucero in the front passenger seat and the complainant in the backseat, the two gave [Esparza] directions to Bryan. As they were traveling on Highway 290 toward Bryan, Lucero woke the complainant and told her that she "was really scared" and [Esparza] "was acting weird." Lucero explained that when she woke the complainant, the complainant did not appear to be oriented as to where she was or understand what was going on. The complainant was "still half asleep" and "not really coherent to what [was] going on at that time."

4

Lucero eventually managed to get out of the car and "took off running to the highway because cars were coming and [she] wanted to get help." When Lucero looked back, she saw that the complainant was still in the backseat and [Esparza] was out of the car. When Lucero saw [Esparza] get out of the car, she "had a feeling he was coming after [her], so [she] ran to the other side where the other oncoming cars were coming." After no one offered to stop to assist her, Lucero "took [her] shoes off and [she] continued running" and stopped at the first house she came to. Lucero told the residents that the complainant was in danger and to call for emergency assistance. When police officers arrived at the residence, Lucero explained what had happened, gave the officers [Esparza]'s business card that he had given her, which contained his name printed on the card, and asked them to help her find the complainant. After an officer called in the complaint, he learned that the complainant had already been found and taken to a hospital.

The complainant testified that as they were driving to Bryan, she fell asleep in the backseat of the car, and the "next thing [she] knew [she] was waking up because [they] were pulled over." After Lucero escaped, [Esparza] came back to the car, got in the driver's seat, and told the complainant that if she got in the front seat and did what he told her to do, she would be alright. The complainant climbed backwards into the front seat, and [Esparza] told her to put her head down. She explained that she still had not gotten a good look at [Esparza]. As she faced the dashboard, [Esparza] "laid his hand over" the complainant "as if he was using [her] head as an arm rest."

As [Esparza] drove back toward Houston, the complainant was crying, and [Esparza] "started being nice" and told her that "he wasn't going to hurt" her and would "take [her] back into town and drop [her] off somewhere." Then, [Esparza] pulled over the car, "reclined his seat back a little bit," and "unzipped his pants." The complainant explained that she "knew something was going to happen." They were in a dark area, [Esparza] "withdrew his penis and he told [the complainant] he knew [she] did this with [her] husband." [Esparza] "drew [the complainant] closer to him and he put [her] head between his legs and he stuck his penis in [her] mouth and the thought made [her] gag and [she] kept gagging." [Esparza] told the complainant that "if [she] threw up on him, [she] would be sorry . . . [a]nd he would hurt [her] really bad." [Esparza] then told the complainant "to roll over on [her] stomach and pull [her] pants down." He "reclined the passenger's seat and he pushed [her], to roll over on [her] stomach, and [she] had [her] head turned toward the passenger's window, looking out that way, and [she] knew he had climbed on top of [her] from behind." [Esparza] got on top of the complainant and began

5

having vaginal intercourse. The complainant explained that at no time was the vaginal or oral intercourse consensual.

The complainant stated that "[o]nce he had finished and he pulled out, he asked me if I had come, if I had come when he came. And I told him yes I had because I figured if I told him no, he would start all over again and I didn't want to go through it again." After [Esparza] "was done," he picked up a bandana, poured Coke over it, and told the complainant "to make sure [she] cleaned [herself] well." The complainant explained that she cleaned herself, but not in the manner that [Esparza] had ordered. [Esparza] told the complainant that he was going to drop her off and for her "to phone somebody, anybody, he didn't care who, just as long as it wasn't the police because he made" the complainant give him her Texas Driver's License and he memorized the information.

The complainant further testified that [Esparza] then drove back into town, "stopped at [a] corner and he told [the complainant] not to look at him, not to look at the car and to walk away in the opposite direction that he drives." After [Esparza] drove off, the complainant walked to a convenience store and called for emergency assistance. When police officers arrived, the complainant explained what had happened, and was taken to a hospital for a rape kit. When questioned as to whether she could identify her attacker, she explained that she did not "remember what he looked like" because she never got a good look at his face while they were at the club and, while in the car, she was never able to "get a good look at him" because he kept her "face down." The complainant stated that she knew [Esparza] had raped her because Lucero and Cantu identified [Esparza] as the man in the car and "[h]e was the only person the whole time in the car."

Mary Cantu, the complainant's sister, testified that [Esparza] was the man that left the nightclub with Lucero and the complainant.

Harris County Sheriff's Deputy D.R. Warren testified that during the early morning hours of January 2, 1994, he was dispatched to a sexual assault call in Hockley, Texas. Warren explained that upon his arrival, Lucero told him of the last location where she had seen [Esparza] and the complainant. When Warren arrived at that location, he "received a call from another officer from L.B.[J.] Hospital that they had" the complainant. Lucero gave Warren [Esparza]'s business card.

Emilia Leiva, [Esparza]'s wife, with the assistance of a Spanish translator, testified that on the evening of January 1, 1994, she and [Esparza] went to her sister's house around 8:00 p.m. "or a little after" and were there with family and friends "until about 2:15, 2:45 or 2:30." She described [Esparza] as wearing a "plaid shirt, some khaki pants and some black shoes."

Freddy Galvan, Emilia's brother-in-law, with the assistance of a Spanish translator, testified that Emilia and [Esparza] arrived at his house "between 8:00 and 8:30" on January 1, 1994. The three then went to the house of a friend, Misael Rivas, and they "were there for about an hour, while they got dressed, and then [they] came home." When they arrived "at home," they were making plans because [they] wanted to go [out] and then it was late and [they] stayed there "at home." According to Galvan, Emilia and [Esparza] left Galvan's house around 1:00 or 1:30 a.m.

Misael Rivas, with the assistance of a Spanish translator, testified that on January 1, 1994, Galvan, Emilia, and [Esparza] arrived at Rivas's home at around 9:00 or 10:00 p.m. They were there for approximately one to one and one-half of an hour, and then decided to go to Galvan's house. After they all went to Galvan's house, Rivas returned home between 11:00 and 11:30 p.m. Rivas stated that Galvan, Emilia, and [Esparza] remained at Galvan's house after Rivas left.

Milagro Leiva, [Esparza]'s sister-in-law, with the assistance of a Spanish translator, testified that she hosted a party at her house on the evening of January 1, 1994. At around 8:00 or 9:00 p.m., [Esparza], Emilia, Milagro, and her family were present. Rivas and his family arrived at Milagro's house around 9:00 or 10:00 p.m. According to Milagro, Rivas and his family left around 11:00 p.m., and [Esparza] and Emilia left around 1:00 or 2:00 a.m.

Before the defense rested, at a bench conference, the following exchange occurred,

> [Esparza's counsel]: At this time I would respectfully request leave of the Court that it's time to give a reasonable amount of time to subpoena or try to bring in Pamela McGinnis along with the rape kit.

> [Court]: Have you made that contact with her?

> [Esparza's counsel]: No, we have not made contact with her.

7

[Court]: What do you expect?

[Esparza's counsel]: Well, basically, as I understand, her testimony was unable to link. Her testimony is not going to be able to link along with commit any rape that evening. I believe I read in the offense report where [the complainant] had sex a day or two before this and they had found some vaginal smears, some sperm, and I just want to [sic].

[Court]: What hospital does she work in?

[Esparza's counsel]: She don't work [sic] at an office. She works at the [Medical Examiner's] Office.

[State]: And I have a question, you are saying this evidence somehow clears your client?

[Esparza's counsel]: No, but it would help elicit.

[State]: In what way?

[Esparza's counsel]: It did have a swab and a smear. There was testimony by [the complainant] that she had applied some Coca Cola on a bandana, that she attempted to clean up, that she didn't clean herself out and that I want the jury to hear her testiomny [sic] from the individual that conducted the examination of the complaining witness following the rape.

[Court]: What would she testify to bearing on this case?

[State]: The semen was found inside.

[Esparza's counsel]: No, the semen was found on the cotton swab but it [is] inconclusive.

[State]: I'l [sic] show you the report. That's not what it says.

The trial court indicated that if Pamela McGinnis was not present in court by a certain time, then [Esparza] would rest at that time. McGinnis never testified at trial.

*Esparza v. State*, 264 S.W.3d 82, 84-86 (Tex. App. — Houston [1st Dist.] Aug. 30, 2007).[1] After granting Esparza's petition for discretionary review, the Texas Court of Criminal Appeals reversed and remanded his case to determine whether DNA testing would yield exculpatory results. *See Esparza v. State*, 282 S.W.3d 913 (Tex. Crim. App. 2009).

Exhibits show that DNA testing was conducted at the Texas Department of Public Safety Crime Laboratory in August of 2009. After considering the lab report, the trial court found that the results of the DNA tests were not favorable or exculpatory and did not establish Esparza's innonce. [Doc. # 7, Exh. B]. Although buccal (oral) swabs from the victim yielded no DNA from Esparza, testing of sperm and epithelial cells recovered from vaginal swabs of the victim were consistent with Esparza's DNA. According to the lab report, the odds of someone other than Esparza being the source of the DNA found in the victim's vagina are approximately 1 in 60.68 quintillion. Based on these unfavorable results, the trial court denied Esparza's post-conviction motion under Chapter 64 on January 28, 2010.

Esparza filed another state habeas corpus application on December 10, 2010, alleging that (1) because lab tests of the oral swab taken from the victim did not contain his DNA, he is "actually innocent" of forcing the victim to perform "oral sex" on him as she testified at trial; (2) the prosecution violated his right to due process by withholding the report by Pamela McGinnis of the Harris County Medical Examiner's Office; and (3) his defense

---

[1]     A transcript of the bench conference, which contains several small typographical errors, is found in the *Court Reporter's Record* for February 14, 1995, at pages 181-83.

counsel was ineffective for failing to secure the wrongfully withheld report prior to trial in 1995.  The trial court entered findings of fact recommending that Esparza's second and third grounds for relief be dismissed as successive and that his first ground for relief (the actual-innocence claim) be denied based on the forensic lab report showing that Esparza's DNA was recovered from vaginal swabs taken of the victim.  The Texas Court of Criminal Appeals agreed, dismissing grounds two and three, and denying Esparza's application with respect to his claim of actual innocence.  *See Ex parte Esparza*, No. WR 11,882-06, 2011 WL 2473275 (Tex. Crim. App. June 22, 2011).

Esparza now seeks a writ of habeas corpus under 28 U.S.C. § 2254 to challenge his conviction for aggravated sexual assault in cause number 763935.  In the pending federal habeas petition, which the Court received on October 26, 2011, Esparza raises the same claims that were found in his latest state habeas corpus application.  Esparza alleges that he is entitled to relief because:  (1) he is actually innocent of forcing the victim to perform "oral sex"; (2) the prosecution violated his right to due process by withholding the report by Pamela McGinnis before his trial in 1995, and (3) his defense attorney was ineffective for failing to secure a copy of that report.  The respondent argues that the petition must be dismissed for lack of jurisdiction because it is a second or successive application for federal habeas corpus relief for purposes of 28 U.S.C. § 2244(b), and Esparza has failed to request the requisite authorization to proceed from the Fifth Circuit.  The parties' contentions are discussed below under the governing federal habeas standard of review.

## II.     **DISCUSSION**

This case is governed by the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), codified as amended at 28 U.S.C. § 2244(b), which was enacted to make it "significantly harder for prisoners filing second or successive federal habeas applications under 28 U.S.C. § 2254 to obtain hearings on the merits of their claims." *Graham v. Johnson*, 168 F.3d 762, 772 (5th Cir. 1999).  In that respect, before a second or successive application permitted by this section may be filed in district court, the applicant must move in the appropriate court of appeals for an order authorizing the district court to consider the application.  28 U.S.C. § 2244(b)(3)(A).  For petitions filed in this district, the Fifth Circuit performs this "'gatekeeping' function" to determine if the petitioner makes a "'prima facie showing' . . . of possible merit to warrant a fuller exploration by the district court." *In re Salazar*, 443 F.3d 430, 431 (5th Cir. 2006) (quotations and internal citation omitted).

If the pending petition qualifies as a successive writ, this Court has no jurisdiction to consider it absent prior authorization from the Fifth Circuit.  The Fifth Circuit has recognized that "a prisoner's application is not second or successive simply because it follows an earlier federal petition." *In re Cain*, 137 F.3d 234, 235 (5th Cir. 1998).  Rather, a subsequent application is "second or successive" when it: (1) "raises a claim challenging the petitioner's conviction or sentence that was or could have been raised in an earlier petition"; or (2) "otherwise constitutes an abuse of the writ." *Id.*; *see also United States v. Orozco-Ramirez*, 211 F.3d 862, 867 (5th Cir. 2000).

The second and third claims raised by Esparza, regarding the report prepared by Pamela McGinnis of the Harris County Medical Examiner's Office, meet the criteria for

successiveness because the report was discussed during trial in 1995, at a bench conference

which included the prosecutor and defense counsel, who was obviously aware of the report.[2]

*See Court Reporter's Record*, Feb. 14, 1995, at 142-43, 181-83.  Because Esparza could have

raised claims concerning this report in his prior habeas proceeding, claims two and three are

successive and subject to dismissal for lack of authorization from the Fifth Circuit in

compliance with 28 U.S.C. § 2244(b)(3)(A).

Esparza's only other claim (claim one), which alleges that he is actually innocent of

forcing the victim to perform oral sex, also qualifies as successive in this Court's view.  In

support of this claim, Esparza points to DNA test results of oral swabs taken from the victim.

As Espzara notes, the test results of these oral swabs did not indicate that his DNA was

present.  Esparza argues, therefore, that this evidence contradicts the victim's testimony that

Esparza forced her to perform oral sex without her consent.  Liberally construed, Esparza's

true claim about the oral swabs takes issue with the victim's credibility, which concerns the

---

[2]      Esparza argues that the State suppressed the report in violation of *Brady v. Maryland*, 373
U.S. 83, 87 (1963), and that his attorney was ineffective for failing to secure a copy prior to
trial.  To establish a *Brady* violation, a defendant must prove that: (1) the evidence was
favorable to the defendant, either because it was exculpatory or because it has impeachment
value; (2) the evidence was withheld or suppressed by the prosecutor, either willfully or
inadvertently, and (3) the evidence was material such that prejudice ensued.  *See Strickler
v. Greene*, 527 U.S. 263, 281-82 (1999); *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995).
Because the record shows that the report was available to the defense, Esparza fails to show
that the State suppressed this evidence.  *See United States v. Infante*, 404 F.3d 376, 386 (5th
Cir. 2005) ("*Brady* rights are not denied where the information was fully available to the
defendant and his reason for not obtaining and presenting such information was his lack of
reasonable diligence.").  Moreover, Esparza does not demonstrate that the report was
exculpatory, favorable, or otherwise material to the alibi defense that he presented at trial.
Nor does Esparza show that his counsel, who was clearly familiar with the report, was
ineffective for failing to obtain a copy.

factual sufficiency of the evidence.  *See Schlup v. Delo*, 513 U.S. 298, 330 (1995) (discussing

the standard for challenges to the legal sufficiency of the evidence under *Jackson v. Virginia*,

443 U.S. 307 (1979)); *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005) (observing that,

under *Jackson*, "[a]ll credibility choices and conflicting inferences are to be resolved in favor

of the verdict").

Esparza has already challenged the sufficiency of the evidence on federal habeas

corpus review.  Those claims were dismissed with prejudice.  *See Esparza v. Cockrell*, Civil

No. 4:01-2826 (S.D. Tex.).  Under these circumstances, the Court concludes that Esparza

must seek authorization from the Fifth Circuit before this Court can consider this claim.[3]

---

[3]     To the extent that Esparza's claim of actual innocence is not successive, his claim is not
cognizable on federal habeas corpus review.  As the Supreme Court has explained, "[c]laims
of actual innocence based on newly discovered evidence have never been held to state a
ground for federal habeas relief absent an independent constitutional violation occurring in
the underlying state criminal proceeding."  *Herrera v. Collins*, 506 U.S. 390, 400 (1993).
Instead, a claim of actual innocence is "a gateway through which a habeas petitioner must
pass to have his otherwise [procedurally] barred constitutional claim considered on the
merits."  *Id.* at 404.  A petitioner seeking to surmount a procedural default through a showing
of "actual innocence" must support his allegations with new, reliable evidence that was not
presented at trial and must show that it was more likely than not that, in light of the new
evidence, no juror, acting reasonably, would have voted to find the petitioner guilty beyond
a reasonable doubt.  *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995).  *See also House v. Bell*,
547 U.S. 518 (2006) (discussing at length the evidence presented by the petitioner in support
of an actual-innocence exception to the doctrine of procedural default under *Schlup v. Delo*).

Notably, the state habeas corpus court rejected Esparza's claim of actual innocence on the
merits.  The state habeas corpus court found that Esparza "failed to state facts that, if true,
would show that he is actually innocent of aggravated sexual assault."  *Ex parte Esparza*,
No. 11,882-06 at 682.  Pointing to the DNA tests conducted by the Texas Department of
Public Safety, which confirmed that sperm and epithelial cells from vaginal swabs of the
victim were consistent with Esparza's DNA profile, the state habeas corpus court found that
"[t]he odds of someone other than [Esparza] being the source of the sperm and DNA found
in the complainant's vagina are approximately 1 in 60.68 quintillion."  *Id.*  In that respect,
(continued...)

*See* 28 U.S.C. § 2244(b)(3)(A).  Absent the requisite authorization from the Fifth Circuit, this Court lacks jurisdiction to consider Esparza's claims.  *United States v. Key*, 205 F.3d 773, 775 (5th Cir. 2000).  The petition, therefore, is subject to dismissal for lack of jurisdiction.

## III.  CERTIFICATE OF APPEALABILITY

Because the habeas corpus petition filed in this case is governed by the AEDPA, a certificate of appealability is required before an appeal may proceed.  *See* 28 U.S.C. § 2253; *See Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997) (noting that actions filed under either 28 U.S.C. § 2254 or § 2255 require a certificate of appealability).  "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals . . . .'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citing 28 U.S.C. § 2253(c)(1)).  Rule 11 of the Rules Governing Section 2254 Cases now requires a district court to issue or deny a certificate of appealability when entering a final order that is adverse to the petitioner.

---

[3](...continued)
> the state habeas corpus court concluded that "results of the new DNA testing conclusively demonstrate [Esparza's] guilt of the offense charged in the primary case." *Id.*  Esparza, who was identified by victim and her aunt, who was present on the night of the offense, fall far short of the stringent standard of proof needed to make a stand-alone claim of actual innocence under *Herrera v. Collins*, 506 U.S. 390 (1993).  *See House*, 547 U.S. at 555 (finding that the petitioner fell short of the "extraordinarily high" threshold showing necessary to make a claim of actual innocence under *Herrera*).

A district court may deny a certificate of appealability, *sua sponte*, without requiring further briefing or argument. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). The petitioner has not made "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2). Likewise, for reasons outlined above, the Court concludes that jurists of reason would not debate whether the procedural ruling in this case was correct. Accordingly, to the extent that one is needed, a certificate of appealability will not issue in this case.

## IV.   **CONCLUSION**

Because the pending federal habeas corpus petition is successive and lacking in authorization, the Court **ORDERS** as follows:

1.     The respondent's motion to dismiss [Doc. # 7] is **GRANTED**.

2.     This habeas corpus proceeding is **DISMISSED** without prejudice for lack of jurisdiction.

3.     A certificate of appealability is **DENIED**.

The Clerk shall send a copy of this order to the petitioner.

SIGNED at Houston, Texas, on June 22, 2012.

Nancy F. Atlas
United States District Judge